IN THE UNITED DISTRICT COURT
FOR THE NORTHEN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SOUTHAMPTON, LTD.;<br>HELIOS FINANCIAL HOLDINGS<br>CORP.; DEALERS ASSURANCE<br>CORPORATION and<br>SOUTHWEST REINSURE, INC., | ) )<br>) )<br>) )<br>) )<br>) )<br>) ) | |
|     Plaintiffs, | ) )<br>) ) | |
| v. | ) )<br>) ) | CIVIL ACTION NO.  3:18-CV-1089 |
| DAVID LE NORMAN; LE NORMAN<br>PROPERTIES, LLC; BYFORD-<br>LE NORMAN DUNCAN BCG, LLC;<br>BYFORD-LE NORMAN DUNCAN<br>CDJR, LLC; LB HOLDINGS LLC;<br>KENT GARDNER; TY HARTWIG;<br>RICHARD HORTON; MICHAEL E.<br>DEEBA, TRUSTEE; RANDY<br>BYFORD; FOUR HORSEMEN AUTO<br>GROUP, INC., CHISHOLM TRAIL<br>AUTO GROUP, LLC, CHISHOLM<br>TRAIL AUTO GROUP II, LLC. AND<br>CHISHOLM TRAIL REAL ESTATE<br>LLC, | ) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) ) | |
|     Defendants | ) | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs file their Original Complaint and would show the Court as follows:

### I.

### PARTIES; NATURE OF THE CASE; JURISDICTION AND VENUE

**A.**    **The Parties.**

    1.      Plaintiffs were and are creditors of Mike and Julie Terry and two Duncan

auto dealerships that bore Mr. Terry's name:  Mike Terry Jeep Chrysler and Mike Terry Chevrolet.  Both Mike Terry and his wife, Julie Terry, are in bankruptcy—one in Oklahoma City and the other in Kansas.  For this reason, neither is joined here as a defendant.

2.     The couple acquired during their marriage the control block of Defendant Four Horsemen Auto Group, Inc. ("4H"), which in turn owned the controlling interest in the dealerships and in the real estate company on which one of the dealerships operated. The dealerships were owned through Oklahoma limited liability companies:  Defendant Chisholm Trail Auto Group, LLC, and Defendant Chisholm Trail Auto Group II, LLC (collectively the "CTAGs").  The real estate company was named Chisholm Trail Real Estate, LLC ("CTRE").

3.     Plaintiffs hold a final, unpaid Texas judgment (the "Judgment") against Defendants 4H, CTAGs, and CTRE (collectively, the "Judgment Debtors"), a true and correct copy of which is attached hereto as Exhibit A.  Part of this lawsuit involves an effort to collect the Judgment through the application of the equitable remedy of alter ego, post judgment garnishment, and a turn over order of claims that the Judgment Debtors have against the other Defendants in this Civil Action.  The lawsuit also involves claims to set aside fraudulent transfers made to avoid payment of the Judgment and the underlying debt.

4.     Plaintiffs are in the business of supplying gap and extended warranty products to auto dealerships.  Their family of companies operate under the trade name "Southwest Re."  Southwest Re is one of the major suppliers of gap and extended warranty products in the United States.

5.      Plaintiff Southampton, Ltd is an alien business corporation organized and existing under the laws of the Turks and Caicos Islands with its principal place of business in the Turks and Caicos Islands.

6.      Plaintiff Southwest Reinsure, Inc. is a New Mexico Corporation having its principal place of business in Albuquerque, New Mexico.

7.      Plaintiff Helios Financial Holdings Corp. is a New Mexico Corporation having its principal place of business in Santa Fe, New Mexico.

8.      Plaintiff Dealers Assurance Company, is an Ohio Corporation with its office in Dallas.

9.      Defendant 4H is a citizen of Oklahoma.  It may be served with process by serving Roger Ely, its officer, at 4101 Copper Rock Drive, Edmond, Oklahoma, 73025.

10.      Defendants CTAGs and CTRE are citizens of Oklahoma.  They may be served with process by serving their manager, Roger Ely, at the aforementioned address.

11.      Defendants 4H, CTRE, and CTAGs are joined herein for the purpose of enforcing the Texas judgment through all necessary writs, including but not limited to writs of garnishment and attachment.  The last known address of the judgment debtors is P.O. Box 3071, Edmond, Oklahoma  73003.  A copy of this Complaint and its application for post judgment garnishment is being mailed to the Judgment Debtors at the aforementioned address.

12.      Defendants Randy Byford and David Le Norman are two of the Bid Rigging Conspirators, as defined *infra*.  They are natural persons and residents of Oklahoma.  They may be served with process as follows:

a.  Randy Byford at 14236 Calais Circle, Oklahoma City, Oklahoma 73142.

b.  David Le Norman at 5333 Wisteria Drive, Oklahoma City, Oklahoma 73142.  David Le Norman may also be found at 4727 Gaillardia Parkway, Suite 200, Oklahoma City, Oklahoma 73142.

13.     Defendant Le Norman Properties, LLC ("Le Norman Properties") is also a Bid Rigging Conspirator.  It paid the kickbacks at issue in this case to facilitate the fraudulent transfers.  It may be served by serving David Le Norman, its manager and chief executive at the above-mentioned addresses.

14.     Defendants Byford-Le Norman Duncan BCG, LLC and Byford-Le Norman Duncan CDJR, LLC, and Defendant LB Holdings, LLC (collectively, the "Big Rigging Buyers") are Oklahoma entities controlled by Defendants Byford and Le Norman.  The Bid Rigging Buyers are also Bid Rigging Conspirators.  The Bid Rigging Buyers may be served through their agent, David Le Norman, at 4727 Gaillardia Parkway, Suite 200, Oklahoma City, Oklahoma 73142.

15.     Defendant Kent Gardner is a natural person and a citizen of Oklahoma. Gardner is one of the Bid Rigging Conspirators.  He may be served with process at 16721 Rainwater Trail, Edmond, Oklahoma  73012-8430.

16.     Defendant Ty Hartwig is a natural person and a citizen of Oklahoma. Hartwig is one of the Bid Rigging Conspirators.  He may be served with process at 14225 Gaillardia Place, Oklahoma City, Oklahoma 73142.

17.     Defendant Richard Horton is a natural person and a citizen of Oklahoma. Horton is one of the Bid Rigging Conspirators.  He may be served with process at 5800 Rosebay Court, Oklahoma City, Oklahoma 73142.

18.     Defendant Michael E. Deeba, sued solely in his capacity as Trustee of Richard Horton Trusts ("Deeba"), is a natural person and a citizen of Oklahoma.  He is also a Bid Rigging Conspirator.  He may be served with process at 119 N Robinson Ave, Oklahoma City, Oklahoma 73102.

19.     On information and belief, Defendant Deeba was at all material times a trustee for one or more of the Richard Horton Trusts at the same time that he acted as a receiver in connection with the collusive foreclosure sale that is at issue in this civil action, and it is in that capacity in which he is sued here. Those same trusts are believed to have been an investor in HGH or collateralized or guaranteed the loan borrowed by HGH to finance HGH's investment in CTRE and the CTAGs. Defendant Deeba is sued at this time solely in his capacity as trustee. This is because Deeba, in his other role as a state court receiver, enjoyed a qualified immunity.  Plaintiffs reserve their right to amend to sue Deeba individually upon a showing  that this qualified immunity is inapplicable to some or all of the claims asserted herein. The receivership played out in state court in Duncan, Oklahoma and is discussed in greater detail later in this Complaint.  Plaintiffs also reserve their right to identify the Horton trusts with more specificity and to add or delete trustees as may be appropriate.

20.     HGH is a dissolved Oklahoma limited liability company and for that reason is not joined to this case.  HGH, the minority shareholder or member of the Judgment

Debtors, was owned directly or indirectly by Defendants Richard Horton, Kent Gardner, and Ty Hartwig.  Horton and Hartwig were on the managing boards of CTRE and the CTAGs under the operating agreements.  Gardner was a *de facto* manager.

## B.      Nature of the Case.

21.      In addition to seeking to enforce the Judgment, this lawsuit alleges a Section One Sherman Act violation, RICO violations, and common law fraud.

22.      The Sherman Act violation concerns a bid rigging scheme to suppress bidding for assets conveyed to the Bid Rigging Buyers by Deeba, a court appointed receiver for the CTAGs and CTRE.  Deeba was appointed as a receiver in state court proceedings in Duncan, Oklahoma.  No Plaintiff (and, indeed, no unsecured creditor) was a party to the Duncan proceedings at the time of the foreclosure sale by receiver.

23.      One of the many beneficiaries of the bid rigging conspiracy was Defendant Horton, an indirect owner of the CTAGs and CTRE, and a person with whom Deeba had a long and deep personal and business relationship.  This relationship was ongoing while Deeba simultaneously acted as a receiver.  On information and belief, Deeba's lawyer or law firm used in the receivership proceedings had a relationship with Horton as well.

24.      In return for a guaranteed below market price and a boycott of all competing bidders, Byford and Le Norman agreed to split the purchase price to be paid for the assets between the receiver (Deeba) and the investors (Terry, 4H, and HGH), leaving behind over $6 million of unpaid trade debt.

25.      The total consideration paid to the receiver was around $4,075,000.00, less than the actual purchase price for the assets.  The buyers, through Le Norman Properties,

paid around $2.5 million of the purchase price by secret wire transfers to investors HGH and Mike and Julie Terry—all outside the receivership and outside the reach of creditors. These payments were in amounts roughly equal to the equity contributions of the investors plus a tidy profit.  The payments were documented as loans and equity purchases.  Those equity owners who did not receive cash kickbacks instead did an equity swap—swapping equity in the old car dealerships for equity in the new dealerships arising out of the receivership.  They were also relieved of company debt they had guaranteed,

26.     As to RICO and common law fraud, Plaintiffs allege a conspiracy to defraud Plaintiffs and other unsecured creditors of the Duncan Auto Dealerships that began around 2012 and is still on going.

**C.     Jurisdiction and Venue.**

27.     Jurisdiction is predicated under 28 USC Section 1332 because there is complete diversity of citizenship and each claim against each Defendant exceeds the sum or value of $75,000, exclusive of interest and costs.

28.     Jurisdiction is also predicated under 28 USC Sections 1331 and 1337.

29.     Personal jurisdiction over the Judgment Debtors and venue in this Court is proper because there is a forum selection clause in the contracts underlying the Judgment signed by the Judgment Debtors specifying courts in Dallas County as the exclusive venue for any dispute arising out of the agreements.  The remaining Defendants are bound by the forum selection clauses under concepts of agency, alter ego, estoppel, and third-party beneficiary.

30.     Personal jurisdiction is also predicated under 18 USC Section 1965, which permits nationwide service of process.  The ends of justice require that all Defendants be joined in this District.  This District has exclusive jurisdiction and venue over the Judgment Debtors, which comprise in part the enterprise whose affairs were conducted through a pattern of racketeering activities.  The primary targets of the alleged RICO conspiracy, Sherman Act violation, and fraud resided in this State.  The Defendants were linked by a common purpose, and they were represented by the same lawyers or were jointly represented by lawyers who shared a common purpose in designing and implementing the fraudulent transfer scheme that lies at the heart of the RICO conspiracy.

31.     Defendant Le Norman, who provided the financing for the fraudulent transfers, has an agent, may be found, and transacts his affairs in the Northern District of Texas.  Defendant Le Norman operates through a number of inter-related limited liability companies that he controls either as CEO or as the sole member manager.  His flagship is Templar Energy LLC ("Templar").  Templar is a portfolio company financed by a private equity firm with a presence in Texas.  Templar was formed in December of 2012.  In September or October of 2013—near the time of the wire transfers described herein—Templar closed on a $1 billion acquisition of oil and gas properties in the Texas Panhandle sold by Forest Oil Corporation, n/k/a Sabine.  On information and belief, Le Norman and Le Norman Operating, LLC, maintain an office in the Northern District and both have availed themselves of use of the Courts in Texas.

32.     Personal jurisdiction is also proper in this District because Defendants have committed a tort in whole or in part in this State.

33.     Venue is proper as well under 28 USC Section 1391 because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District.

## II.

## GENERAL BACKGROUND

**A.     The Investors Acquire the Dealerships From Battison by Committing a Fraud in Texas.**

34.     Plaintiffs incorporate the foregoing allegations herein by reference.

35.     For eight years, Mike Terry ran the Finance and Insurance Department at Hudiburg, a prominent car dealership in Oklahoma City.   He also oversaw sales of automobiles.

36.     Roger Ely, Mr. Terry's accountant, approached Mr. Terry on behalf of Mr. Ely's partners with a proposal to acquire two auto dealerships from the Battison family in Duncan, Oklahoma.

37.     Mr. Ely's partners were Vahid Salalati and Greg Luster.  Ely, Salalati, and Luster (collectively, "Terry's Partners" or "the Three Horsemen") have settled and are not made parties to this litigation.

38.     Mr. Salalati was a lawyer/entrepreneur.   He would provide the business acumen to arrange financing to buy the dealerships.

39.     Greg Luster practiced law with a law firm in Oklahoma City before partnering with Mr. Salalati.  Mr. Luster agreed to act as the lawyer for Mr. Terry and 4H.

40.     Mr. Ely agreed to act as the accountant for the dealerships and keep an office in Duncan.

41.     The four partners called themselves the Four Horsemen and incorporated 4H to act as their investment vehicle.

42.     The Four Horsemen then sought out Defendants Hartwig, Horton, and Gardner as their co-investors, and the co-investors formed HGH as their investment vehicle.

43.     The investors needed cash to close on the Battison dealerships, so the investors agreed among themselves to borrow money third parties.  HGH disregarded corporate form and treated its equity investment as a personal asset, which violated the franchise agreements with Chrysler and GM, and which left the business greatly undercapitalized.

44.     The co-investors, through HGH, raised north of $2 million from Interbank.

45.     The Four Horsemen got its money from a variety of sources, including Southwest Re and Ally Financial, both with offices the Dallas area.

46.     From Southwest Re in Dallas, the Judgment Debtors borrowed $500,000 as an advance against future sales of warranty products and gap insurance.  In return, the Judgment Debtors fraudulently promised Southwest Re that it would have an exclusive on all warranty and gap products.

47.     Unbeknownst to the vendors, the Judgment Debtors made the same deal with Ally Financial.  Ally Financial agreed to make a substantial cash advance in return for the same (but mutually exclusive) exclusive dealing agreement.

48.     With cash in hand after playing both ends against the middle, the investors closed on the Battison dealerships in December of 2012.

**B.     The Investors Fight Over Control.  The Duncan Lawsuit Is Filed, And
          A Friendly Receiver Is Appointed.**

49.     The fraud did not stop there.

50.     As is customary in the industry, those wanting a GM or Chrysler franchise must commit to investing a large amount of unrestricted capital to fund operations.  Car dealerships need substantial cash to operate.  New cars are sold, and older cars are taken in trade.  Once a new car comes off the floor plan, money is due the floor planner.  New credit advances on trades and re-sales of trades take time, but cash is needed immediately to pay off the loan on the trade-in.  And if new inventory sits too long on the floor (a major factor with the Battison inventory), it can no longer serve as collateral for the floor plan.  Money is needed to pay the floor planner to cover the short fall when unsold inventory is too stale to act as collateral.

51.     Unbeknownst to the trade creditors, there was far too little unrestricted capital invested in the Duncan Dealerships.  To make matters worse, the Terrys and the HGH investors routinely looked to company assets to pay off personal debts.

52.     Mike and Julie Terry routinely used funds in company bank accounts and from company credit cards to pay personal obligations.

53.     Horton and his group, whose bank loaned $2 million, expected the debt to be paid regardless of whether there was sufficient capital or surplus to declare a dividend.

54.     Income from operations proved inadequate to satisfy the personal needs of the investors.

55. Similarly, by the summer of 2013, HGH and its owners owed $140,000, and their bank threatened to audit the loan if there were not an immediate payment. HGH did not want bank auditors paying too close attention to the transaction.

56. The cash squeeze prompted a power grab to remove Mr. Terry from the dealership and take over control.

57. The investors (other than Terry) hired Mr. Luster's friend, who still worked at Mr. Luster's former law firm. Together they took immediate steps to remove Mr. Terry and freeze the bank accounts of the dealerships.

58. Mr. Terry and the CTAGs (the Terry family owned two-thirds of 4H, which owned two-thirds of the subsidiaries) reacted by filing a lawsuit in Duncan, Oklahoma and getting a restraining order against the other investors, in a suit styled *Michael Terry et al. v. Vahid Salalati et al.*, Case No. CJ-2013-149E, Stephens County District Court, Oklahoma (the "Receivership Court"). The other investors counterclaimed, and Deeba was appointed as receiver over the CTAGs and CTRE (the "Receivership Assets").

**C.     The Bid Rigging Conspiracy Is Formed.  Le Norman Gets a Sweetheart Deal from the Investors, and He Agrees to Split the purchase price for the Dealerships with the Investors in Fraud of Unsecured Creditors.**

59. The CTAGs, CTRE, and 4H were swimming in debt at the time of the receivership and the bid-rigging conspiracy. Secured creditors were threatening foreclosure. Terry's partners blamed Terry for the problem and wanted him out of control of the dealerships while they took steps to liquidate or find a new partner.

60. With creditors all over the country and outside the jurisdiction of an Oklahoma state court, a federal bankruptcy with nationwide service of process and the

power to stay litigation and possibly reorganize the debtors was the logical solution.  But Defendants knew that with that solution came unwanted transparency and oversight.  A federal bankruptcy meant that they would clearly lose their equity as assets were liquidated and the debts of the business paid.

61.     Instead, the investors, who lived (and whose lawyers lived and practiced) in close proximity to the federal bankruptcy court in Oklahoma City, settled instead on using a state court receivership in Duncan.  Unlike the federal bankruptcy court in Oklahoma City, the district court of Stephens County operated like so many state courts operate in small, rural communities.  It handled all manner of disputes-from criminal to civil to domestic relations.  It did not have the benefit or luxury of a briefing clerk or a U.S. Trustee to help oversee the conduct of the players.

62.     At about the same time as the Duncan lawsuit was filed and a receiver appointed, the Investors (other than Terry) spoke with Defendant Byford, a friend of Horton's and a car dealer with a proven track record.  The investors asked if Byford had an interest in purchasing (or becoming a partner) in the dealerships and taking Mike Terry out of his investment.

63.     Defendant Byford was very interested.  He was familiar with the Duncan dealerships and knew they could be quite valuable.

64.     The investors (all but Terry) wanted to install Byford as the receiver while they negotiated a deal with him and Le Norman, but they were concerned that it might look too contrived if Defendant Byford were both receiver/seller of the assets and also the buyer of the assets.

65.     Instead, Defendants chose to install a friendly receiver and have the receiver, who knew nothing about the auto dealership business, contract with Defendant Byford to run the dealerships during the receivership.  In this way Byford and Le Norman would be the *de facto* receiver/seller and the buyer all at the same time, but the proceedings would have the veneer of a lawful receivership.

66.     On August 26, 2013, Deeba, who was not yet privy to all the secrets, sought and obtained a routine order approving bidding procedures from the Duncan Court.  The sale of the assets was to be by auction through competitive bids.  The auction was to occur on September 9, 2013.

67.     Terry planned to bid at the auction and had secured some financing.

68.     Additionally, a prominent car dealer from Amarillo, Texas, had shown interest to bid.  A number of other potential bidders, whose identity is not yet known to Plaintiffs, had expressed interest as well.

69.     Between August 26 and September 5, 2013, the investors became worried that a sale of the assets at a fair price through the receiver by auction would not yield enough after creditors were paid to pay off their equity.

70.     On or about September 4 or 5, 2013, a deal was struck.

71.     The Defendants had been working with the criminal authorities in Duncan to have Julie Terry arrested.  The Terry family had a number of small children, and Defendants felt that the threat of incarceration would help Terry see the benefit of taking part in a collusive foreclosure sale.

72.     In return for calling off the criminal authorities, Mike Terry agreed not to bid for the assets at the foreclosure sale provided Defendants would pay him some of the cash coming from Byford and Le Norman.   All the investors, at the urging of Byford and Le Norman, agreed for the receiver to take down the order to sell by competitive bids and to boycott any other bidders except for Byford and Le Norman.  A "single  bidder" foreclosure sale was ordained by a consent order dated September 6, 2013.

73.     The September 6 Order authorized the receiver to sell the assets to Byford/Le Norman at a very favorable price—conditioned only on franchises being granted later by GM and Chrysler to the new owners.  Byford and Le Norman agreed to handle the secured debt (they had to for the deal to work), but they would pay only $300,000 to the trade creditors (likely those lucky trade creditors who were deemed necessary to the new business).  Byford/Le Norman agreed for the rest of the purchase price to be paid by wire transfer directly to Terry and to the HGH investors outside the receivership.

74.     Though the Duncan lawsuit was settled on September 5, 2013, and even though the reason for the appointment of a receiver no longer existed, the investors, Byford and Le Norman agreed to keep the friendly receivership in place so that self-serving consent orders could be signed later in an effort to insulate the bad actors from liability and to disguise the collusive foreclosure sale.

**D.      The Conspirators Devise a "Credit Bid" Scam As The Means For Defrauding Trade Creditors, And Then They Try To Cover It Up As A Loan To An Insolvent Borrower—4H.**

75.      The investors schemed behind the scenes with the buyers to divert part of the sales proceeds to their personal bank accounts.  To this end they devised a "credit bid" scam whereby the buyers of the assets would pay large sums of money to purchase worthless equity from the original investors and then "credit bid" the recently acquired equity as part of the purchase price to be paid to the receiver for the assets.  There was only one small problem—equity owners cannot magically become secured creditors and bid their equity at a foreclosure sale.  Legally, all consideration payable in a foreclosure sale had to be in the form of cash, cash equivalents, assumption of secured debt, or a valid credit bid made by a secured lender.

76.      The consideration to be paid to the receiver for the assets appears on page 4 of the September 6 Order.  On page 4, the kickbacks masquerade as "credit bids."  The "credit bid" to be paid to the receiver was said to be equal to shareholder equity in an amount in excess of $3.6 million.  A true and correct copy of the  September 6 Order is attached hereto as Exhibit B.

77.      A credit bid is where a bidder at foreclosure, in lieu of or in addition to bidding cash, bids the lesser of his secured debt or the value of his collateral.

78.      In truth, however, there were no "credit bids."  None of the potential buyers of the assets under the September 6 Order had loaned money to the auto dealerships secured by dealership assets.

79.     Byford and Le Norman purchased HGH's worthless minority position in the CTAGs and CTRE and, at the same time, bought out Terry's worthless control block in 4H by "loaning" money to 4H.

80.     4H's sole assets were the entities in Receivership, and it had no money to repay loans.

81.     The Three Horsemen received an equity swap in lieu of cash.  The Three Horsemen, Byford and Le Norman plotted for 4H to rise from the ashes and rename itself "Bear Creek."  Bear Creek would be a co-bidder and partner with Byford and Le Norman for the Receivership Assets.  4H, n/k/a "Bear Creek," would also bid its equity in the CTAGs and CTRE at the foreclosure sale—just as Le Norman and Byford would bid in their recently purchased HGH equity.

82.     The Defendants knew better -- they knew they were engaging in a fraudulent "credit bid" as a means of defrauding unsecured creditors.

83.     The Defendants here were represented by silk stocking law firms, and many of the Defendants were themselves lawyers.

84.     Deeba, though not a lawyer, was represented by a lawyer who was a specialist in creditor's rights.  Moreover, Deeba was a professional receiver with vast experience serving as a receiver and as a trustee in federal bankruptcies.

85.     Defendants thought they would never be caught.  Defendants believed the unsecured creditors were too disorganized and held claims too small to investigate and uncover Defendants' complex fraud.

86.     Defendants also thought that a unique law applicable to Oklahoma companies would make collection too lengthy and expensive a process.   Under a law enacted in Oklahoma and in a handful of other states, creditors are forbidden from bringing suit against the officers, directors, managers, or owners of an Oklahoma corporation or limited liability company for debts of the business until a final judgment is first obtained against the business and returned unexecuted.

87.     On September 5, 2013, Mike Terry cashed out his equity and gave up any claims to the business.   In return, Defendant Le Norman Properties wire transferred over $500,000 to a bank account maintained by the Terries' bankruptcy lawyer in Oklahoma City.   After the bankruptcy lawyer took his fee, the balance was wired into Mike and Julie's bank account in Oklahoma.   $100,000 was then immediately wired from that account to the bank account of a friend and fellow car dealer in Kansas for safe keeping.   Eventually that $100,000 was returned to Terry and was used with the balance of the fraudulent transfer to purchase a $500,000 house for cash in Kansas in Julie Terry's name shortly before Mike Terry filed for bankruptcy in Oklahoma City.   In violation of a Kansas State Court Order, the Terrys mortgaged the Kansas property in 2016 or 2017 – just before Julie Terry filed her own personal bankruptcy in Kansas.

88.     On September 5, 2013, Defendant Le Norman Properties purchased HGH's worthless equity for over $2 million. *See Ex*hibit C, attached hereto. The actual wire transfer followed closely thereafter.   As soon as the money hit the HGH bank account, it was immediately wired to Interbank to pay off the HGH loan.   Then HGH was quickly dissolved.

89. Terry's and HGH's equity was worthless because their equity was unmarketable and the September 6 Order, which was part of the same transaction as the wire transfers, rendered the car dealerships insolvent.

90. After the kickbacks were paid, Le Norman and Byford tried to cover-up their fraud by "recasting" the HGH equity purchase as a loan to 4H guaranteed by the Three Horsemen. *See Ex*hibit D, attached hereto.

91. GM and Chrysler finally approved the new franchises.

92. On or about April 30, 2014, the fraudulent transfers to the Bid Rigging Buyers was consummated when bills of sale and a receiver's deed for the real estate was executed.

**E.    The Texas Injunction and Defendants' Bad Faith Federal Bankruptcy in Oklahoma to stop the Texas litigation.**

93. Southwest Re filed its Original Petition against the Judgment Debtors for breach of contract in Dallas County on November 8, 2013.

94. The Texas litigation posed a problem to the conspirators because they still needed time to secure approval from the franchisors and to consummate the transfer of assets. This was not the time for an unsecured creditor to start taking discovery and asking questions.

95. The Defendants decided to keep the Duncan litigation alive and use it to stall the Texas litigation and to delay collection efforts until their fraud could be consummated.

96. In truth, though not a matter of public record, the Duncan litigation completely settled on September 5, 2013 and the reason for the appointment of a receiver

came to an end.  Deeba was appointed solely to act as receiver for the companies until the dispute between the owners was resolved.   That happened on September 5.   After September 5, HGH and 4H could simply have sold their subsidiaries or their assets to Byford and Le Norman without the fiction of conducting a forced foreclosure sale.

97.     But the Defendants still needed to buy time—at least until GM and Chrysler approved the franchises and the fraudulent conveyances were consummated. And the fiction of a foreclosure sale and self-serving consent orders rubber stamped by the Duncan court would provide cover for their fraud.

98.     Sometime between September 6, 2013, and January 8, 2014, Byford, Le Norman, Deeba, the Three Horsemen, and the HGH investors met and conferred on how to use the collusive receivership to obstruct and delay the Texas litigation.

99.     A decision was made that 4H and Deeba, as receiver, would file a Special Appearance in the Texas case, which they did on or about January 8, 2014.  They planned to conceal the collusive nature of the Receivership from the Texas court.

100.     In the Texas Litigation, Defendants also knowingly sponsored false testimony that Terry had signed the contracts underlying the Petition without authority and that no one knew about the contracts.

101.     Deeba, individually and through counsel, represented in Texas that there were no assets in the estate except those that secured debt.  There was nothing for unsecured creditors except for the $300,000 mentioned in the September 6 Order.

102.     These representations were made at least once on a telephone call between Plaintiff's counsel in Dallas  and Deeba. In that telephone call a question was raised about

the propriety of Deeba was using the same lawyers in the Dallas case who represented 4H, and that this seemed like a conflict of interest. 4H was an equity owner in the receivership entities, and Deeba's duty as receiver was to marshall assets for the benefit of unsecured creditors—not to protect the interest of the equity owners. Deeba assured Plaintiff's counsel that he was acting independently of the equity owners and that use of common counsel was purely a financial consideration forced by the fact that there were no assets in the estate to hire lawyers. Nothing was said about wire transfers to equity owners or that Deeba had personal and business ties to one the equity owners.

103.    Deeba and his counsel never disclosed in that call or otherwise in the Texas case their knowledge of or involvement with the wire transfers.

104.    Deeba and his counsel never disclosed that the "credit bid" was a fiction used to funnel millions of dollars to investors outside the receivership.

105.    Deeba and his counsel never disclosed that Deeba had a close personal and business relationship with Horton and that this relationship was on-going at the time of the receivership proceedings.

106.    Deeba and his counsel represented that the receiver was doing his best to raise cash for unsecured creditors through litigation against an insurance company when nothing could be further from the truth.

107.    These acts amount to fraud.  It was fraud for Deeba to hold himself in Texas as a judicial officer with a fiduciary duty to act in the best interest of creditors and to simultaneously fail to disclose his ties with the investors, to fail to disclose his knowledge of wire transfers to investors made outside the receivership, and to fail to disclose that the

buyers making a "credit bid" in connection with a foreclosure sale were not in fact secured creditors.

108.    The scam worked, for a time, as the Texas trial court granted the special exception in deference to what was represented to be an on-going receivership in a sister jurisdiction.

109.    An appeal was taken.

110.    While the Texas litigation was pending, and without any notice to the Dallas Trial Court or the Dallas Court of Appeals (and while those proceedings were on going), the fraudulent conveyances occurred on April 30, 2014.   Later, and still acting as a "receiver" in Texas, Deeba, through more consent orders, withdrew as a receiver in Duncan and had his bond released by the Duncan Court.

111.    The Dallas Court of Appeals reversed and remanded.   After the remand, Deeba's lawyer informed the Court for the first time that his client (who had participated on the appeal as a party) was no longer a receiver.

112.    After remand, the Texas trial court conducted a preliminary injunction hearing.   Salalati testified live.   Deeba testified by deposition.   The Trial Court found that Deeba, Byford, and Le Norman had engaged in fraudulent transfers and used the Judgment Debtors as alter egos to perpetrate a fraud on creditors.   A true and correct copy of the order is attached hereto as Exhibit E.

113.    Shortly after the hearing, Defendants then colluded to cause the Judgment Debtors (their alter egos and empty buckets) to file a bad faith bankruptcy in the Western District of Oklahoma in 2016 to stay the Texas litigation.   The Judgment Debtors had not

filed federal tax returns since 2013, and they had not done any business since the appointment of Deeba as a receiver in 2013.

114.   After an evidentiary hearing, the chief bankruptcy judge for the Western District of Oklahoma ruled that CTRE's bankruptcy had been filed in bad faith as a tactic to obstruct and delay the Texas proceedings.

115.   The Federal Bankruptcy Court dismissed the CTRE bankruptcy, and the other three bankruptcies were voluntarily dismissed to avoid sanctions.

116.   After the Judgment Debtors intervened in Texas to replace Deeba as a receiver, and Plaintiffs were able (at long last) secure judgments against the empty buckets in Texas in December of 2017.  Attempts to collect the judgments have failed.

## III.

## CAUSES OF ACTION

A.   **Count One:  Enforcement Of Judgment.**

117.   The foregoing allegations are incorporated herein by reference.

118.   Plaintiffs hold a judgment rendered in Texas in the approximate amount of $3 million against 4H, the CTAGs, and CTRE (collectively, the "Judgment Debtors"). This judgment is final and unsatisfied in whole or in part.

119.   The judgment has been or is in the process of being duly registered in Oklahoma pursuant to the Oklahoma Uniform Enforcement of Foreign Judgment Act, O.S. Section 12-721.  Given the prior bankruptcy filings and the absence of any tax returns for the last several years,  execution will no doubt be returned unsatisfied.

120.   The judgment attached hereto was later duly authenticated as required by 28 USC Section 1738 and is entitled to Full Faith and Credit by this Court as though it were a final federal judgment entered by the Court.

### *Alter Ego*

121.   The Court may disregard the form of an Oklahoma corporation and limited liability company and hold the owners, officers, directors, or managers of the business liable for the debts of the company where the form of the business organization has been used to commit a fraud or a crime or when it is necessary to protect the rights of third parties and accomplish justice.  The Court should do so here.

122.   The auto dealerships were so thinly capitalized that the business failed only seven months after it was purchased from the Battison family.  The Battison family had successfully operated the dealerships for years before the sale.

123.   The investors never observed corporate formalities.  Even the ownership of assets as reflected by tax returns was different from the ownership of assets as reflected in the company records.

124.   The investors never observed corporate formalities.  Even the ownership of assets as reflected by tax returns was different from the ownership of assets as reflected in the company records.

125.   The investors treated their equity contributions as secured loans, leaving insufficient assets to pay creditors.

126.   The investors obtained part of their seed capital to acquire the dealerships through fraudulent promises of exclusivity made to vendors.

127.   The investors used the corporate form as a means to maintain a bogus receivership the purpose of which was to defraud creditors.

128.   The investors misused the corporate form by causing the Judgment Debtors to file false bankruptcy schedules and federal bankruptcy petitions in bad faith solely to protect the alter egos.

129.   The advance secured from Plaintiffs to be used in the business was secured through a knowingly false promise of exclusivity.

130.   Defendants used a collusive foreclosure sale as the means to wire around CTRE's and the CTAGs' operating agreements, which required in a liquidation or dissolution that the assets of the business be sold and the proceeds applied to discharge debt before any distribution to investors.

131.   All of the Defendants colluded to use the form of the Oklahoma companies as a means to commit, conceal, and further a fraud on creditors.  For all practical purposes, the Judgment Debtors ceased to exist on September 6, 2013, but Defendants kept the form and legal fiction of the Judgment Debtors alive not for any legitimate business purpose, but solely to consummate a collusive foreclosure sale and to use judicial process and the courts in bad faith to obstruct the collection of lawful debts.

### *Post Judgment Garnishment*

132.   On December 31, 2013, certain of the Bid Rigging Buyers entered into a contract of sale with Deeba as receiver.  A true and correct copy of the contract of sale is attached hereto as Exhibit F.

133.   All conditions precedent to the contract of sale were performed by Deeba as receiver on or about April 30, 2014.

134.   The purchasers promised as consideration, *inter alia*, a credit bid in the amount of the shareholder equity in excess of $3.6 million.

135.   The purchasers failed to make a credit bid or to pay the receiver a sum of money equal to the promised credit bid.  They then concealed their failure to perform the contract through false and fraudulent consent orders entered by the Duncan court.

136.   The time for payment of the promised consideration has passed.  The Bid Rigging purchasers are the Judgment Debtors' account debtors.

137.   Plaintiffs as judgment creditors pray that the Court enter a judgment of garnishment against the Bid Rigging Buyers as garnishees for the lesser of $4,075,000.00 or the unpaid balance of the Judgment Debtors' obligation to Plaintiffs.

138.   Alternatively, Plaintiffs as judgment creditors pray that the Court enter a judgment of garnishment against the Bid Rigging Buyers in quantum meruit.

### *Turnover Order*

139.   Plaintiffs pray that the Court order the Judgment Debtors to turn over all claims against Defendants for breach of duty, anti-trust violations, RICO, and conspiracy.

## B.   Count Two:  Racketeer-Influenced and Corrupt Organization ("Rico"), 18 U.S.C. § 1962

140.   Plaintiffs incorporate the foregoing allegations herein by reference.

141.    The Duncan Auto Dealerships are an enterprise whose activities affect interstate commerce.  Alternatively, the union of Mr. and Mrs. Terry is an enterprise whose activities affect interstate commerce.

142.    Defendants, individually and in concert with others, have conducted the affairs of the enterprise through a pattern of racketeering activities.

143.    At the time of the wire transfers, Defendants knew that the $500,000 advance had been secured by a fraudulent promise of exclusivity.  Defendants also knew that Mr. and Mrs. Terry had been embezzling from the undercapitalized business. Defendants nonetheless agreed to further the fraud and criminal conduct by paying another $500,000 of company money to redeem Terry's equity instead of retiring company debt.   In return for the cash payment or bribe, Mr. and Mrs. Terry disregarded their fiduciary obligations to the Judgment Debtors by agreeing to cooperate in the Credit Bid scheme and not to bid or to aid anyone else in bidding for the assets.

144.    Criminal informations were ultimately returned against the Terrys.  These are attached hereto and incorporated herein by reference as Exhibit G.  Each of the charged counts involved the use of mail or the wires.

145.    The pattern of racketeering activities include but are not limited to the following:

      a.    Bid rigging in violation of Section One of the Sherman Act;

      b.    Use of the wires to pay insiders as part of a fraudulent transfer scheme;

      c.    Use of the mail and wires to disguise the kickbacks and cover up the misconduct;

     d.      Use of the mail and wires with the intent to defraud trade creditors into making large cash advances based on a fraudulent promises of exclusivity;

     e.      Obstruction of justice by furnishing false testimony, concealing evidence, dodging process, and causing false and misleading "consent" court orders to be entered to facilitate a fraud on creditors, and by giving false oaths;

     f.      Fraud in connection with a Federal bankruptcy.

146.   Plaintiffs suffered damages and are entitled to all remedies under the federal RICO statute, including actual damages, treble damages, and attorneys' fees. The predicate offenses described above each contributed to the non-payment of debts that were owed, caused enormous costs of collection, and caused lost future profits that would have been enjoyed had the Terrys and the Duncan Auto Dealerships not been operated as a criminal enterprise.

## C.    Count Three:  Violations of the Sherman Act, 15 U.S.C. § 1

147.   Plaintiffs incorporate the foregoing allegations herein by reference.

148.   The Defendants entered into an unlawful bid rigging arrangement that (i) unreasonably restrained trade and competitive bidding for the receivership assets and (ii) fixed a below-market price to favor Byford and Le Norman price fixing.

149.   This bid rigging scheme affected interstate commerce.

150.   Plaintiffs lost future profits and were unable to collect lawful debts as a direct result of these restraints of trade.

151.   Plaintiffs are entitled to all remedies under the Sherman Act, including actual damages, treble damages, and attorneys' fees.

**D.**      **Count Four:  Fraudulent Transfer**

152.   Plaintiffs incorporate the foregoing allegations herein by reference.

153.   Plaintiffs hold a judgment for an amount in excess of $3 million against Defendant CTRE.

154.   CTRE was formerly a real estate holding company.

155.   CTRE acquired its real estate through a contract of sale with the Battison family dated August 18, 2012.  The purchase price was $5,510,000.

156.   The purchase by CTRE closed on or about December 19, 2012.

157.   CTRE paid the purchase price through a combination of cash and debt.

158.   $4,215,000 in purchase money financing was provided by Bank of the West secured by a mortgage in that amount.

159.   The balance of the purchase price was paid in cash and funded through contributions to capital made by HGH and Terry, through 4H.

160.   Ely has testified at a meeting of creditors conducted in the now dismissed bankruptcy of CTRE in Oklahoma that an appraisal of the property for an amount in excess of $7 million was furnished in connection with the Battison closing.

161.   In September of 2013, and shortly before the Texas litigation against CTRE was filed, the investors schemed to sell the real estate to Byford and Le Norman for less than fair consideration and in fraud of Plaintiffs, who were CTRE's only unsecured creditors.

162.   Byford and Le Norman agreed to pay off the mortgage held by Bank of the West, a mortgage that was personally guaranteed by Terry, Luster, Ely and Salalati

163.     Byford and Le Norman agreed to pay the balance of the purchase price for the real estate by wire transfers made to HGH and Terry outside the receivership.  This agreement was reached on or about September 5, 2013.  The payments were initially documented as a loan to 4H and a purchase of HGH's equity.

164.     The loan was bogus.  4H had no means to repay the loan, and it never did.

165.     The equity in HGH was unmarketable and worthless.

166.     On April 30, 2014, and while the Texas litigation against CTRE was pending, Defendant CTRE, through a collusive foreclosure sale, conveyed the real estate in fraud of creditors to Defendant Holdings free and clear of all liens and for no consideration paid by the Holdings.

167.     Byford and Le Norman directly or indirectly may have paid CTRE's debt to Bank of the West, which filed a release of lien on May 14, 2014.

168.     On or about July 10, 2014, Holdings, acting through Le Norman, mortgaged the real estate to International Bank of Commerce to secure a debt of $10,000,000 owed by LB Holdings II, LLC to International Bank of Commerce ("IBC").

169.     On or about May 1, 2015, LB Holdings II, acting through Le Norman, refinanced its $10,000,000 debt and added a revolving line of credit.  A new, restated mortgage or third-party pledge was granted by Holdings to IBC to secure the debt of the affiliate.

170.     On or about February 1, 2017, Defendant Holdings again mortgaged the property, this time to Spitfire Energy Group LLC, to secure a construction loan of $3,500,000.

171.    The fraudulent transfers to and by Byford and Le Norman acting on behalf of limited liability companies they controlled were done with the actual intent to hinder, delay, or defraud Plaintiffs from collecting their debt and enforcing their judgment against CTRE.

172.    Alternatively, the transfers were done at a time when CTRE was insolvent or, as a result of the transfers, would become insolvent.

173.    Alternatively, the foreclosure sale was collusive, and CTRE did not receive reasonably equivalent value for the conveyance of the real estate.

174.    Plaintiffs pray that the Court set aside the conveyance of real estate by CTRE to Holdings (and all subsequent transfers) so that Plaintiffs may levy their judgment on the real estate and conduct a foreclosure sale.

175.    Plaintiffs further pray for a judgment against Holdings (the initial transferee) and each person who benefitted from the transfer and subsequent transfers by Holdings for the lesser of the value of the real estate when transferred or the amount of the judgment against CTRE.  The beneficiaries include, but are not limited to, each of the Defendants other than the Judgment Debtors.

### E.    Count Five:  Fraud and Conspiracy

176.    Plaintiffs incorporate the foregoing allegations herein by reference.

177.    The Defendants knowingly participated in or joined a conspiracy to defraud Plaintiffs into making an advance based on a false promise of exclusivity.  The Defendants knowingly participated in or joined in a scheme to defraud creditors through a collusive foreclosure sale.

178.    Defendants conspired to cause the receiver to intervene in  the Texas proceeding pretending to be a disinterested officer of the court and to conceal the wire transfers and his relationship with Horton.

179.    Plaintiffs are entitled to recover all their actual damages and punitive damages.

## IV.

## **PRAYER**

WHEREFORE, Plaintiffs respectfully request that upon final trial of this case, the Court award Plaintiffs:

1.    all the relief herein specifically requested;

2.    all costs of court;

3.    pre- and post-judgment interest at the highest rate allowed by law; and

4.    all such other and further relief to which Plaintiffs may be justly entitled.

Respectfully submitted,

By: */s/ Peyton Healey*
Mark L. Taylor
State Bar No. 00792244
mark@powerstaylor.com
Peyton Healey
State Bar No. 24035918
peyton@powerstaylor.com
Meredith Matthews
State Bar No. 24055180

POWERS TAYLOR LLP
8150 N. Central Expressway, Suite 1575
Dallas, Texas 75206
214.239.8900 (Telephone)

214.239.8901 (Facsimile)

**COUNSEL FOR PLAINTIFFS**